Harry LEWIS, Plaintiff,

v.

John L. VOGELSTEIN, Edward H. Malone, William D. Rollnick, John W. Amerman, Jill E. Barad, Harold Brown, James A. Eskridge, Tully M. Friedman, Ronald M. Loeb, Edward N. Ney, Christopher A. Sinclair and Mattel, Inc., Defendants.

Civil Action No. 14954.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 29, 1996.
Decided: March 7, 1997.
Revised: March 11, 1997.

Joseph A. Rosenthal, and John G. Day, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington; A. Arnold Gershon, P.C., New York City, Of Counsel, for Plaintiff.

Daniel A. Dreisbach, and Luke E. Dembosky, of Richards, Layton & Finger, Wilmington, for Defendants.

ALLEN, Chancellor.

This shareholders' suit challenges a stock option compensation plan for the directors of Mattel, Inc., which was approved or ratified by the shareholders of the company at its 1996 Annual Meeting of Shareholders. Two claims are asserted.

First, and most interestingly, plaintiff asserts that the proxy statement that solicited shareholder proxies to vote in favor of the adoption of the 1996 Mattel Stock Option Plan ("1996 Plan" or "Plan") was materially incomplete and misleading, because it did not include an estimated present value of the stock option grants to which directors might become entitled under the Plan. Thus, the first claim asserts that the corporate directors had, in the circumstances presented, a duty to disclose the present value of future options as estimated by some option-pricing formula, such as the Black–Scholes option-pricing model.[1]

Second, it is asserted that the grants of options actually made under the 1996 Plan did not offer reasonable assurance to the corporation that it would receive adequate value in exchange for such grants, and that such grants represent excessively large compensation for the directors in relation to the value of their service to Mattel. For these reasons, the granting of the option is said to constitute a breach of fiduciary duty.

On this motion, this substantive liability theory is also pressed as an "entire fairness" claim. Plaintiff maintains that because the Plan constitutes a self-interested transaction by the incumbent directors, all of whom qualify for grants under the 1996 Plan, they must justify it as entirely fair in order to avoid liability for breach of loyalty, which it is said they cannot do. As shown below, this approach does not constitute a different claim than that stated above.

Pending is defendants' motion to dismiss the complaint for failure to state a claim upon which relief may be granted. A motion of this type may be granted only when it appears reasonably certain that plaintiff would not be entitled to the relief requested, even if all the facts as stated in the complaint are true and all inferences fairly inferable from those allegations are drawn in plaintiff's favor. *Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099 (1985).

For the reasons set forth below I conclude that there is no legal obligation for corporate directors who seek shareholder ratification of a plan of officer or director option grants, to make and disclose an estimate of present value of future options under a plan of the type described in the complaint. There is, therefore, no basis to conclude that failure to set forth such estimate constitutes a violation of any board obligation to set forth all material facts in connection with a ratification vote. Second, I conclude that the allegations of the complaint are not necessarily inconsistent with a conclusion that the 1996 Plan constitutes a waste of corporate assets. Thus, the complaint may not be dismissed as failing to state a claim.

## I.

The facts as they appear in the pleading are as follows. The Plan was adopted in 1996 and ratified by the company's shareholders at the 1996 annual meeting. It contemplates two forms of stock option grants to the company's directors: a one-time grant of options on a block of stock and subsequent, smaller annual grants of further options.

With respect to the one-time grant, the Plan provides that each outside director will qualify for a grant of options on 15,000 shares of Mattel common stock at the market price on the day such options are granted (the "one-time options"). The one-time options are alleged to be exercisable immedi-

---

1. *See generally* STEPHEN A. ROSS, ET AL., CORPORATE FINANCE 629–631 (3d ed. 1993).

ately upon being granted although they will achieve economic value, if ever, only with the passage of time. It is alleged that if not exercised, they remain valid for ten years.[2]

With respect to the second type of option grant, the Plan qualifies each director for a grant of options upon his or her re-election to the board each year (the "Annual Options"). The maximum number of options grantable to a director pursuant to the annual options provision depends on the number of years the director has served on the Mattel board. Those outside directors with five or fewer years of service will qualify to receive options on no more than 5,000 shares, while those with more than five years service will qualify for options to purchase up to 10,000 shares.[3] Once granted, these options vest over a four year period, at a rate of 25% per year. When exercisable, they entitle the holder to buy stock at the market price on the day of the grant. According to the complaint, options granted pursuant to the annual options provision also expire ten years from their grant date, whether or not the holder has remained on the board.

When the shareholders were asked to ratify the adoption of the Plan, as is typically true, no estimated present value of options that were authorized to be granted under the Plan was stated in the proxy solicitation materials.

## II.

As the presence of valid shareholder ratification of executive or director compensation plans importantly affects the form of judicial review of such grants,[4] it is logical to begin an analysis of the legal sufficiency of the complaint by analyzing the sufficiency of the attack on the disclosures made in connection with the ratification vote.

### A. Disclosure Obligation:

■ I first note a preliminary point: The complaint's assertion is not simply that the ratification of the 1996 Plan by the Mattel shareholders was ineffective because it was defective. If that were the whole of plaintiff's theory, the effect of any defect in disclosure under it would be only to deny to the board the benefits that ratification bestows in such a case. *See In re Wheelabrator Tech., Inc. Shareholders Litig.*, Del.Ch., 663 A.2d 1194 (1995). The thrust of the allegation, however, is that in seeking ratification and in, allegedly, failing fully to disclose material facts, the board has committed an independent wrong. Despite the fact that shareholder approval was not required for the authorization of this transaction and was sought only for its effect on the standard of judicial review, there is language in Delaware cases dealing with "fair process", suggesting that a misdisclosure may make available a remedy, even if the shareholder vote was not required to authorize the transaction and the transaction can substantively satisfy a fairness test. *Cf. In re Tri–Star Pictures, Inc., Litig.*, 634 A.2d 319, 333 (1993) (nominal damages available for misdisclosure in all events.)[5]

---

**2.** As to the term of the one-time options there exists a material dispute of relevant fact. The complaint alleges those options are valid for ten years. Defendants assert however that a reading of the Plan itself certainly establishes that in fact the options expire *sixty days after an outside director ceases to be a member of Mattel's board or in ten years whichever occurs first.* Thus, according to defendants, the value of the options only continues while the grantee is serving on the board and is, presumably, affected by their motivational effect. This fact if true would render these options very difficult to value under option pricing theory. The procedural setting of the motion requires me to assume that plaintiff's allegation is correct.

**3.** From a corporation law perspective one might defend as rational the greater incentive for longer serving directors; from a corporate gover-

nance perspective, however, the wisdom of this structure, which creates greater incentives to remain on the board, could sustain debate.

**4.** *See generally* Robert C. Clark, Corporate Law § 6.1 (1986).

**5.** In fact in considering disclosure in the ratification context it may be useful to distinguish (1) innocently incomplete or defective (including negligent omission) disclosure, in which event the effect of failure to fully and adequately disclose material facts may be only to deny the ratification effect, from (2) knowing attempts to manipulate shareholders through deliberately false or misleading disclosures, in which event the additional subjective state component—the deliberate injury to the protected relationship—may justify not simply a denial of burden shifting but a separate remedy. *Cf.* Lawrence A. Hamer-

In all events, in this instance, the theory advanced is that the alleged non-disclosure itself breaches a duty of candor and gives rise to a remedy. The defect alleged is that *the shareholders were not told the present value of the compensation to the outside directors that the Plan contemplated i.e.*, the present value of the options that were authorized. It is alleged that the present value of the one-time options was as much as $180,000 per director and that that "fact" would be material to a Mattel shareholder in voting whether or not to ratify the board's action in adopting the 1996 Plan. According to plaintiff, the shareholders needed to have a specific dollar valuation of the options in order to decide whether to ratify the 1996 Plan. Such a valuation could, plaintiff suggests, be determined by application of formulas such as the widely-used option-pricing model first devised by Professors Fischer Black and Myron Scholes.[6] Plaintiff urges that this court should hold that because no such valuation was provided to the shareholders, the proxy statement failed to disclose material matter and was, therefore, defective.

## B. Disclosure of Estimated Present Value of Options to be Granted:

■ Estimates of option values are a species of "soft information" that would be de-

rived from sources such as the specific terms of a plan (including when and for how long options are exercisable), historical information concerning the volatility of the securities that will be authorized to be optioned, and debatable assumptions about the future. Permissible and mandated disclosure of "soft information"—valuation opinions and projections most commonly—are problematic for federal and state disclosure law.[7] Such estimates are inherently more easily subject to intentional manipulation or innocent error than data concerning historical facts. Such estimates raise threats to the quality and effectiveness of disclosure not raised by disclosure of historical data.

As the terms of the options granted under the 1996 Plan demonstrate, option-pricing models, when applied to executive or director stock options, are subject to special problems. Significant doubt exists whether the Black–Scholes option-pricing formula, or other, similar option-pricing models, provide a sufficiently reliable estimate of the value of options with terms such as those granted to the outside directors of Mattel.[8]

First, the Black–Scholes formula assumes that the options being valued are issued and publicly traded. Publicly-traded options have certain common characteristics that are important in assessing their value. Steven

mesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Duty of Disclosure*, 49 Vand. L.Rev. 1087, 1150 (1996).

6. Fischer, Black & Myron Scholes, *The Pricing of Options and Corporate Liabilities*, 81 J.Pol.Econ. 637 (1973).

7. In Delaware, for example, *compare Repairman's Service Corp. v. National Intergroup, Inc.*, Del.Ch., C.A. No. 7811, Walsh, V.C. (Mar. 15, 1985), 1985 WL 11540 (holding that soft information such as projections and estimates of value need not, generally, be disclosed to shareholders); *In re Anderson, Clayton Shareholders Litig.*, Del.Ch., 519 A.2d 680 (1986) (stating that an appraisal of asset values need not be disclosed to shareholders in a proxy statement) and *Weinberger v. Rio Grande Indus.*, Del.Ch., 519 A.2d 116 (1986) (holding that *pro forma* financial projections need not be disclosed to shareholders because sufficient indicia of reliability for them was not established), the last two of which applied the materiality standard set forth in *Flynn v. Bass Bros. Enterp.*, 744 F.2d 978 (3rd Cir. 1984), *with Lynch v. Vickers Energy Corp.*, Del.

Supr., 383 A.2d 278, 280–81 (1977) (finding that an estimate of a target corporation's net asset value as calculated by the target management was material to shareholders deciding whether to tender their shares to the majority shareholder). *See generally* Joel Seligman, *The SEC's Unfinished Soft Information Revolution*, 63 Fordham L.Rev. 1953 (1995) (providing a history of the SEC's treatment of "soft information").

8. For example, the term of such an option—a critical variable in estimating present value—is uncertain because it *expires when exercised, at any time during its life*, rather than at a fixed period at its maturity. *See also* footnote 2, regarding the dispute in this case concerning whether options terminate sixty days after any director to be employed by Mattel. Such a provision would also make calculation of a present value of the option grant difficult since the probability of a directors' termination at any (or every) point during the ten year term is impossible to know and very hard to responsibly estimate. Thus, one of the vital components of an option-pricing formula, the life of the option, appears quite problematic in instances of this sort.

Huddart & Mark Lang, *Employee Stock Exercises: An Empirical Analysis,* 21 J.ACCT. & ECON. 1, 9 (1996). The options granted to the Mattel directors under the Plan include restrictive terms that are different from those of typical, publicly-traded options and which may effect their value. Importantly, for instance, the directors' options are not assignable.

Second, the Black–Scholes model overstates the value of options that can be exercised at any time during their term because it does not take into account the cost-reducing effect of early exercise. Huddart & Lang at 18. The Mattel directors' one-time options are not options that are exercisable on a set date. They can be exercised at any time after the grant for a period, according to plaintiff, of up to ten years.

Third, the value of publicly-traded options and restricted options responds very differently to increased volatility of the price of the underlying stock. The volatility of the stock price is one of the important variables in the Black–Scholes formula. ROSS, ET AL., CORPORATE FINANCE 629–31 (3d ed. 1993). Publicly-traded options increase in value as the price volatility of the underlying stock increases. The value of options of the type granted to the Mattel directors, on the other hand, arguably decreases with increased volatility, because the holders are more likely to exercise the options early since they cannot be traded. Nalin Kulatilaka & Alan J. Marcus, *Valuing Employee Stock Options,* FIN.ANALYSTS J. Nov.–Dec. 1994, at 46, 51.[9]

█ Plaintiff argues that option pricing techniques are sufficiently developed so that the Financial Accounting Standards Board ("FASB") requires that financial statements state a value of options granted to directors according to a stock-option pricing model. Thus, they assert, the same information should be given to shareholders by directors seeking ratification. There are salient differences, however, between financial statement disclosure of an estimated value of stock options under a plan and disclosure for the purpose of shareholder ratification of adoption of the plan. For instance, financial statements are compiled at the end of the fiscal year, *when the value of the options granted can be assessed with greater certainty,* than is possible at the time the option plan is authorized or ratified since the market price at time of issue is known at that later point.

More broadly, it may be the case that good public policy recommends the disclosure to shareholders of estimates of present value (determined by one technique or another) of options that may be granted as compensation to senior officers and directors, when feasible techniques produce reliable estimates. But while it is unquestionably the case that corporation law plays an important part in the development of public policy in the area of directors' legal relations to corporations and shareholders, including disclosure law, it does not follow that the fiduciary duty of corporate directors is the appropriate instrument to determine and implement sound public policy with respect to this technical issue.

What makes good sense—good policy—in terms of *mandated corporate disclosure* concerning prospective option grants involves not simply the moral intuition that directors should be candid with shareholders with respect to relevant facts, but inescapably involves technical judgments concerning what is feasible and helpful in varying circumstances. Judgments concerning what disclosure, if any, of estimated present values of options should be mandated are best made at this stage of the science, not by a court under a very general materiality standard, but by an agency with finance expertise. An administrative agency—the Securities and Exchange Commission—has a technical staff, is

---

**9.** *Cf.* Regulation S–K, Item 402(b) (mandating that companies report the value of compensation paid to executives in stock options, but not requiring that the value be arrived at by using an option-pricing formula). It should be noted that in this instance the utility of the Black–Scholes or a similar option-pricing formula would also be reduced if the outside directors' options do, in fact, expire sixty days after the directors terminate their employment with Mattel. Because the Plan has not been submitted to the court in a manner that permits its specific provisions to be interpreted, it is not possible at this point to conclude whether this would be another shortcoming of this method of pricing the options.

able to hold public hearings, and can, thus, receive wide and expert input, and can specify forms of disclosure, if appropriate. It can propose rules for comment and can easily amend rules that do not work well in practice. As just one example, any option-pricing formula premised on the assumptions that underlie Professors Black and Scholes's model would be concerned with the expected volatility of the stock over the term of option. How that volatility is itself estimated would be a significant factor in any standardized disclosure regime. But this certainly is not the type of inquiry that the judicial process is designed optimally to address. Clearly, determining whether disclosure of estimates of the present value of options ought to be mandated, and how those values ought to be calculated, is not a subject that lends itself to the blunt instrument of duty of loyalty analysis.

■ In all events, for these reasons, I conclude that, given the tools currently used in financial analysis, a careful board or compensation committee may customarily be expected to consider whether expert estimates of the present value of option grants will be informative and reliable to itself or to shareholders. And if such estimates are deemed by the board, acting in good faith, to be reliable and helpful, the board may elect to disclose them to the shareholders, if it seeks ratification of its actions. But, such "soft information" estimates may be highly problematic and not helpful at all, as for example would likely be the case here, if the options terminate two months after the holder leaves Mattel's board, instead of continuing for ten years, as defendants assert. *See supra* note 2.

■ While generally the materiality of "facts" omitted from a proxy statement is a question of fact unsuitable for determination on a motion to dismiss, nevertheless, I conclude that the allegations of failure to disclose estimated present value calculations fails to state a claim upon which relief may be granted. Where shareholder ratification of a plan of option compensation is involved, the duty of disclosure is satisfied by the disclosure or fair summary of all of the relevant terms and conditions of the proposed plan of compensation, together with any material extrinsic fact within the board's knowledge bearing on the issue. The directors' fiduciary duty of disclosure does not mandate that the board disclose one or more estimates of present value of options that may be granted under the plan. Such estimates may be an appropriate subject of disclosure where they are generated competently, and disclosed in a good faith effort to inform shareholder action, but no case is cited in which disclosure of such estimates has been mandated in order to satisfy the directors' fiduciary duty and I lack sufficient confidence to break that fresh ground. *Absent allegations of intentional manipulation,* where shareholder ratification of a plan of stock option compensation is sought, what may constitute appropriate disclosure respecting estimated present (or other) values of such options grantable under the plan is a subject better left to the judgment of the Securities and Exchange Commission and, subject to that regulatory regime, the judgment of the board seeking such approval.

### III.

Thus, concluding that the complaint does not state a claim for breach of any duty to fully disclose material facts to shareholders in connection with the board's request that the shareholders ratify the board's act of creating a directors' stock option plan, I turn to the motion to dismiss the complaint's allegation to the effect that the Plan, or grants under it, constitute a breach of the directors' fiduciary duty of loyalty. As the Plan contemplates grants to the directors that approved the Plan and who recommended it to the shareholders, we start by observing that it constitutes self-dealing that would ordinarily require that the directors prove that the grants involved were, in the circumstances, entirely fair to the corporation. *Weinberger v. U.O.P., Inc.,* Del.Supr., 457 A.2d 701 (1983). However, it is the case that the shareholders have ratified the directors' action. That ratification is attacked only on the ground just treated. Thus, for these purposes I assume that the ratification was effective. The question then becomes what is the effect of informed shareholder ratifica-

tion on a transaction of this type (*i.e.*, officer or director pay).

## A. Shareholder Ratification Under Delaware Law:

What is the effect under Delaware corporation law of shareholder ratification of an interested transaction? The answer to this apparently simple question appears less clear than one would hope or indeed expect. Four possible effects of shareholder ratification appear logically available: **First**, one might conclude that an effective shareholder ratification acts as a complete defense to any charge of breach of duty. **Second**, one might conclude that the effect of such ratification is to shift the substantive test on judicial review of the act from one of fairness that would otherwise be obtained (because the transaction is an interested one) to one of waste. **Third**, one might conclude that the ratification shifts the burden of proof of unfairness to plaintiff, but leaves that shareholder-protective test in place. **Fourth**, one might conclude (perhaps because of great respect for the collective action disabilities that attend shareholder action in public corporations) that shareholder ratification offers no assurance of assent of a character that deserves judicial recognition. Thus, under this approach, ratification on full information would be afforded no effect. Excepting the fourth of these effects, there are cases in this jurisdiction that reflect each of these approaches to the effect of shareholder voting to approve a transaction.[10]

In order to state my own understanding I first note that by shareholder ratification I do not refer to every instance in which shareholders vote affirmatively with respect to a question placed before them. I exclude from the question those instances in which shareholder votes are a necessary step in authorizing a transaction. Thus the law of ratification as here discussed has no direct bearing on shareholder action to amend a certificate of incorporation or bylaws. *Cf. Williams v. Geier*, Del.Supr., 671 A.2d 1368 (1996); nor does that law bear on shareholder votes necessary to authorize a merger, a sale of substantially all the corporation's assets, or to dissolve the enterprise. For analytical purposes one can set such cases aside.

*1. Ratification generally:* I start with principles broader than those of corporation law. Ratification is a concept deriving from the law of agency which contemplates the *ex post* conferring upon or confirming of the legal authority of an agent in circumstances in which the agent had no authority or arguably had no authority. RESTATEMENT (SECOND) OF AGENCY § 82 (1958). To be effective, of course, the agent must fully disclose all relevant circumstances with respect to the transaction to the principal prior to the ratification. *See, e.g., Breen Air Freight Ltd. v. Air Cargo, Inc., et al.*, 470 F.2d 767, 773 (2d Cir.1972); RESTATEMENT (SECOND) OF AGENCY § 91 (1958). Beyond that, since the relationship between a principal and agent is fiduciary in character, the agent in seeking ratification must act not only with candor, but with loyalty. Thus an attempt to coerce the principal's consent improperly will invalidate the effectiveness of the ratification.[11] RESTATEMENT (SECOND) OF AGENCY § 100 (1958).

Assuming that a ratification by an agent is validly obtained, what is its effect? One way of conceptualizing that effect is that it pro-

---

**10.** *See, e.g., In re Wheelabrator Technologies, Inc., Shareholders Litig.*, Del.Ch., 663 A.2d 1194 (1995) (effect one: effective ratification eliminates any claim for breach of duty of care but only breach of care); *Michelson v. Duncan*, Del. Supr., 407 A.2d 211, 224 (1979) (effect two: effective ratification of director interested transaction triggers waste standard); *Citron v. E.I. DuPont de Nemours & Co.*, Del.Ch., 584 A.2d 490, 500–502 (1990), *quoted with approval in Kahn v. Lynch Communication Systems, Inc.*, Del.Supr. 638 A.2d 1110 (1994) (effect three: effective ratification shifts burden of fairness to plaintiff).

**11.** What constitutes an improper attempt to coerce consent and what constitutes fair conditions set by the agent would, like most fiduciary duty questions, be difficult to generalize about *ex ante*. For example a statement by an agent seeking ratification that unless this transaction is ratified the agent will exercise a legal power to terminate his agency would seem ordinarily within his power and not improper, but if he has arranged things so that the principal's interests are particularly vulnerable at that moment, he is arguably exploiting the relationship and improperly coercing consent.

vides, after the fact, the grant of authority that may have been wanting at the time of the agent's act. Another might be to view the ratification as consent or as an estoppel by the principal to deny a lack of authority. *See* RESTATEMENT (SECOND) OF AGENCY § 103 (1958). In either event the effect of informed ratification is to validate or affirm the act of the agent as the act of the principal. *Id.* § 82.

Application of these general ratification principles to shareholder ratification is complicated by three other factors. **First**, most generally, in the case of shareholder ratification there is of course no single individual acting as principal, but rather a class or group of divergent individuals—the class of shareholders. This aggregate quality of the principal means that decisions to affirm or ratify an act will be subject to collective action disabilities (*see* CLARK, *supra* note 3, at 181–182); that some portion of the body doing the ratifying may in fact have conflicting interests in the transaction; and some dissenting members of the class may be able to assert more or less convincingly that the "will" of the principal is wrong, or even corrupt and ought not to be binding on the class. In the case of individual ratification these issues won't arise, assuming that the principal does not suffer from multiple personality disorder. Thus the collective nature of shareholder ratification makes it more likely that following a claimed shareholder ratification, nevertheless, there is a litigated claim on behalf of the principal that the agent lacked authority or breached its duty. The **second**, mildly complicating factor present in shareholder ratification is the fact that in corporation law the "ratification" that share-

holders provide will often not be directed to lack of legal authority of an agent but will relate to the consistency of some authorized director action with the equitable duty of loyalty. Thus shareholder ratification sometimes acts not to confer legal authority—but as in this case—to affirm that action taken is consistent with shareholder interests. **Third**, when what is "ratified" is a director conflict transaction, the statutory law—in Delaware Section 144 of the Delaware General Corporation Law—may bear on the effect.[12]

**2. Shareholder ratification:** These differences between shareholder ratification of director action and classic ratification by a single principal, do lead to a difference in the effect of a valid ratification in the shareholder context. The principal novelty added to ratification law generally by the shareholder context, is the idea—no doubt analogously present in other contexts in which common interests are held—that, in addition to a claim that ratification was defective because of incomplete information or coercion, shareholder ratification is subject to a claim by a member of the class that the ratification is ineffectual (1) because a majority of those affirming the transaction had a conflicting interest with respect to it or (2) because the transaction that is ratified constituted a corporate waste. As to the second of these, it has long been held that shareholders may not ratify a waste except by a unanimous vote. *Saxe v. Brady*, Del.Ch., 184 A.2d 602, 605 (1962). The idea behind this rule is apparently that a transaction that satisfies the high standard of waste constitutes a *gift* of corporate property and no one should be forced against their will to make a

---

**12.** Most jurisdictions have enacted statutes that appear to offer a procedural technique for removing courts from a fairness evaluation of the terms of director conflict transactions. Generally courts have given them a very narrow interpretation, however. In Delaware that statute enacted in 1967—Act of July 3, 1967, Ch. 50, 56 Del.Laws 151, 170 (1967) amended in 1969—is Section 144 of the DGCL. Early on it was narrowly held that compliance with that section simply removed the automatic taint of a director conflict transaction, but nevertheless left the transaction subject to substantive judicial review for fairness. *See Fliegler v. Lawrence*, Del.Supr., 361 A.2d 218, 222 (1976) (involving claimed in-

dependent board action, not ratification by shareholders). This interpretation tended to be the general judicial response to these "safe-harbor" statutes. *See Cookies Food Prod., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 452–453 (Iowa 1988) (requiring directors who engage in self-dealing to prove that they have acted in good faith). *See also Cohen v. Ayers*, 596 F.2d 733, 740 (7th Cir.1979) (stating that under New York statutory law, in an unratified transaction involving interested directors the burden is on the directors to establish the fairness of the transaction, but where shareholder or disinterested-director ratification has occurred, the burden shifts to the challenger).

gift of their property. In all events, informed, uncoerced, disinterested shareholder ratification of a transaction in which corporate directors have a material conflict of interest has the effect of protecting the transaction from judicial review except on the basis of waste. *Keenan v. Eshleman*, Del. Supr., 2 A.2d 904 (1938); *Gottlieb v. Heyden Chem. Corp.*, Del.Supr., 91 A.2d 57, 58 (1952); *Steiner v. Meyerson*, Del.Ch., C.A. No. 13139, 1995 WL 441999, Allen, C. (July 18, 1995).[13]

### B. The Waste Standard:

 The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. *See Saxe v. Brady*, 184 A.2d 602, 610; *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 189 (1988). Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is *any substantial* consideration received by the corporation, and if there is a *good faith judgment* that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude *ex post* that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. *See Gagliardi v. TriFoods Intern., Inc.*, Del.Ch., 683 A.2d 1049 (1996). Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, *ex post*, to judge appropriate degrees of business risk.

### C. Ratification of Officer or Director Option Grants:

Let me turn now to the history of the Delaware law treating shareholder ratification of corporate plans that authorize the granting of stock options to corporate officers and directors. What is interesting about this law is that while it is consistent with the foregoing general treatment of shareholder ratification—*i.e.*, it appears to hold that informed, non-coerced ratification validates any such plan or grant, unless the plan is wasteful[14]—in its earlier expressions, the waste standard used by the courts in fact was not a waste standard at all, but was a form of "reasonableness" or proportionality review.

*1. Development of Delaware law of option compensation:* It is fair to say I think that Delaware law took a skeptical or suspicious stance towards the innovation of stock option compensation as it developed in a major way following World War II. *See, e.g., Kerbs, et al. v. California Eastern Airways, Inc.*, Del.Supr., 90 A.2d 652 (1952); *Gottlieb v. Heyden Chem. Corp.*, Del.Supr., 91 A.2d 57 (1952); *Id.*, 90 A.2d 660 (1952); *Id.*, Del.Ch., 99 A.2d 507 (1953). Such skepticism is a fairly natural consequence of the common law of director compensation[15] and of the experience that corporate law judges had over the decades with schemes to water stock or to divert investors funds into the hands of promoters or management.[16]

The early Delaware cases on option compensation established that, even in the pres-

---

13. Claims of breach of a duty of care seem difficult to relate to analysis under the waste standard. Duty of care analysis in this or other settings relate to deviations from ordinary care in the circumstances. Probably for this reason, it has been held, on authority, that ratification of a transaction that is thereafter made the subject of a breach of care claim is effective to defeat such a claim completely. *See In re Wheelabrator Tech., Inc. Shareholders Litig.*, Del.Ch., 663 A.2d 1194, 1200 (1995).

14. *See Michelson v. Duncan*, Del.Supr., 407 A.2d 211 (1979); *Beard v. Elster*, Del.Supr., 160 A.2d 731 (1960).

15. *See, e.g., Cahall v. Lofland*, Del.Ch., 114 A. 224, *aff'd*, 118 A. 1 (1922) (directors serve without compensation unless it is explicitly authorized by its charter or by shareholders; director compensation where authorized is "scrutinized closely"; directors may not evaluate the value of their labor when it provides consideration for issuance of stock).

16. *See, e.g., Scully v. Automobile Finance Co.*, Del.Ch., 109 A. 49 (1920).

ence of informed ratification, in order for stock option grants to be valid a two part test had to be satisfied. First it was seen as necessary that the court conclude that the grant contemplates that the corporation will receive "sufficient consideration." *E.g., Kerbs,* at 90 A.2d 652, 656 (1952). "Sufficient consideration" as employed in the early cases does not seem like a waste standard: "Sufficient consideration to the corporation may be, *inter alia,* the retention of the services of an employee, or the gaining of the services of a new employee, *provided there is a reasonable relationship between the value of the services ... and the value of the options ...". Kerbs* at 656 (emphasis added).

Secondly it was held early on that, in addition, the plan or the circumstances of the grant must include "conditions or the existence of circumstances *which may be expected to insure* that the contemplated consideration will in fact pass to the corporation." *Kerbs* at 656 (emphasis added). Elsewhere the Supreme Court spoke of "circumstances which may reasonably be regarded as *sufficient to insure* that the corporation will receive that which it desires ...". *Id.* at 657 (emphasis added).

This (1) weighing of the reasonableness of the relationship between the value of the consideration flowing both ways and (2) evaluating the sufficiency of the circumstances to insure receipt of the benefit sought, seem rather distant from the substance of a waste standard of judicial review. Indeed these tests seem to be a form of heightened scrutiny that is now sometimes referred to as an intermediate or proportionality review. *Cf. Unocal Corp. v. Mesa Petroleum, Co.,* Del. Supr., 493 A.2d 946 (1985); *Paramount Communications v. QVC Network,* Del.Supr., 637 A.2d 34 (1993).

In all events, these tests were in fact operationally very problematic. Valuing an option grant (as part of a reasonable relationship test) is quite difficult, even under today's more highly developed techniques of financial analysis. This would be especially true where, as this case exemplifies, the options are tied to and conditioned upon a continued status as an officer or director. Even more problematic is valuing—or judicially reviewing a judgment of equivalency of value of—the future benefits that the corporation hopes to obtain from the option grant. There is no objective metric to gauge *ex ante* incentive effects of owning options by officers or directors.[17] Beyond this operational problem, the approach of these early option cases may be thought to raise the question, why was it necessary for the court reviewing a stock option grant to conclude that the circumstances "insure" that the corporation will receive the benefits it seeks to achieve.[18] In other contexts, even where interested transactions are involved, a fair (*i.e.,* valid and enforceable) contract might contemplate payment in exchange for a probability of corporation benefit. A corporation, for example, certainly could acquire from an officer or director at a fair price a property interest that had only prospective commercial value.

In *Beard v. Elster,* Del.Supr., 160 A.2d 731 (1960), the Delaware Supreme Court relaxed slightly the general formulation of *Kerbs, et al.,*[19] and rejected the reading of *Kerbs* to the effect that the corporation had to have (or insure receipt of) *legally cognizable* consideration in order to make an option grant valid. The court also emphasized the effect that approval by an independent board or committee might have. It held that what was necessary to validate an officer or director stock option grant was a finding that a reasonable board could conclude from the circumstances that the corporation may rea-

---

17. The benefits that Mattel contemplates receiving from the grant of options, according to its Proxy Statement, is to "attract, retain and reward ... directors" and "to strengthen the mutuality of interests between [the option-recipients] and the ... stockholders." Proxy Statement at 12.

18. *But see supra* note 15.

19. "All stock option plans must ... contain conditions, or [the] surrounding circumstances [must be] such, that the corporation *may reasonably expect* to receive the contemplated benefit from the grant of options [, and] (2) there must be a reasonable relationship between the value of the benefit passing to the corporation and the value of the options granted." *Beard v. Elster,* 160 A.2d at 737 (1960). (emphasis added)

sonably expect to receive a proportionate benefit. A good faith determination by a disinterested board or committee to that effect, at least when ratified by a disinterested shareholder vote, entitled such a grant to business judgment protection (*i.e.*, classic waste standard). *See generally* DAVID A. DREXLER, ET AL., DELAWARE CORPORATION LAW & PRACTICE § 14.03[2] (1997). After *Beard*, judicial review of officer and director option grants sensibly focused in practice less on attempting independently to assess whether the corporation in fact would receive proportionate value, and more on the procedures used to authorize and ratify such grants. But *Beard* addressed only a situation in which an independent committee of the board functioned on the question.

2. *Current law on ratification effect on option grants:* A substantive question that remains however is whether in practice the waste standard that is utilized where informed shareholders ratify a grant of options adopted and recommended by a self-interested board *is* the classical waste test (*i.e.*, no consideration; gift; no person of ordinary prudence could possibly agree, etc.) or whether, in fact, it *is a species of intermediate review* in which the court assesses reasonableness in relationship to perceived benefits.

The Supreme Court has not expressly deviated from the "proportionality" approach to waste of its earlier decision, although in recent decades it has had few occasions to address the subject. In *Michelson v. Duncan*, Del.Supr., 407 A.2d 211 (1979), a stock option case in which ratification had occurred, however, the court repeatedly referred to the relevant test where ratification had occurred as that of "gift or waste" and plainly meant by waste, the absence of *any consideration* ("... when there are issues of fact as to the *existence of consideration*, a full hearing is required regardless of shareholder ratification." 407 A.2d at 223). Issues of "sufficiency" of consideration or adequacy of assurance that a benefit or proportionate benefit would be achieved were not referenced.

The Court of Chancery has interpreted the waste standard in the ratified option context as invoking not a proportionality or reasonableness test a la *Kerbs* but the traditional waste standard referred to in *Michelson. See, e.g., Steiner v. Meyerson,* Del.Ch., C.A. No. 13139, 1995 WL 441999, Allen, C. (July 18, 1995); *Zupnick v. Goizueta,* Del.Ch., 698 A.2d 384, Jacobs, V.C. (1997) (both granting motions to dismiss shareholder claims that options grants constituted actionable waste).

In according substantial effect to shareholder ratification these more recent cases are not unmindful of the collective action problem faced by shareholders in public corporations. These problems do render the assent that ratification can afford very different in character from the assent that a single individual may give. In this age in which institutional shareholders have grown strong and can more easily communicate,[20] however, that assent, is, I think, a more rational means to monitor compensation than judicial determinations of the "fairness," or sufficiency of consideration, which seems a useful technique principally, I suppose, to those unfamiliar with the limitations of courts and their litigation processes. In all events, the classic waste standard does afford some protection against egregious cases or "constructive fraud."

\* \* \*

■ Before ruling on the pending motion to dismiss the substantive claim of breach of fiduciary duty, under a waste standard, I should make one other observation. The standard for determination of motions to dismiss is of course well established and understood. Where under any state of facts consistent with the factual allegations of the complaint the plaintiff would be entitled to a judgment, the complaint may not be dismissed as legally defective. *See, e.g., Rabkin v. Philip A. Hunt Chem. Corp., supra.* It is also the case that in some instances "mere conclusions" may be held to be insufficient to withstand an otherwise well made motion. Since what is a "well pleaded" fact and what is a "mere conclusion" is not always clear, there is often and inevitably some small room

---

20. *See* SEC Rule 14(a)(8), 17 C.F.R. § 240.14a-9 (1996).

for the exercise of informed judgment by courts in determining motions to dismiss under the appropriate test. Consider for example allegations that an arm's-length corporate transaction constitutes a waste of assets. Such an allegation is inherently factual and not easily amenable to determination on a motion to dismiss and indeed often not on a motion for summary judgment. *See, e.g., Michelson v. Duncan,* Del.Supr., 407 A.2d 211 (1979). Yet it cannot be the case that allegations of the facts of any (or every) transaction coupled with a statement that the transaction constitutes a waste of assets, necessarily states a claim upon which discovery may be had; such a rule would, in this area, constitute an undue encouragement to strike suits. Certainly some set of facts, if true, may be said as a matter of law not to constitute waste. For example, a claim that the grant of options on stock with a market price of say $5,000 to a corporate director, exercisable at a future time, if the optionee is still an officer or director of the issuer, constitutes a corporate waste, would in my opinion be subject to dismissal on motion, despite the contextual nature of judgments concerning waste. *See Steiner v. Meyerson,* Del.Ch., C.A. No. 13139, 1995 WL 441999, Allen, C. (July 18, 1995); *Zupnick v. Goizueta,* Del. Ch., 698 A.2d 384, Jacobs, V.C. (1997). In some instances the facts alleged, if true, will be so far from satisfying the waste standard that dismissal is appropriate.

This is not such a case in my opinion. Giving the pleader the presumptions to which he is entitled on this motion,[21] I cannot conclude that no set of facts could be shown that would permit the court to conclude that the grant of these options, particularly focusing upon the one-time options, constituted an exchange to which no reasonable person not acting under compulsion and in good faith could agree. In so concluding, I do not mean to suggest a view that these grants are suspect, only that one time option grants to directors of this size seem at this point sufficiently unusual to require the court to refer to evidence before making an adjudication of their validity and consistency with fiduciary

duty. Thus, for that reason the motion to dismiss will be denied. It is so Ordered.

---

21. *See especially* note 2 above.