**TELXON CORPORATION, Plaintiff,**

v.

**Richard J. BOGOMOLNY, John H. Cribb, Robert A. Goodman, RAJ Reddy, Frank Brick, Norton Rose, Robert F. Meyerson, and Telantis Venture V Inc., Defendants.**

**No. C.A. 17706.**

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 22, 2001.
Decided: Oct. 29, 2001.
Revised: Nov. 1, 2001.

Joseph A. Rosenthal, Esquire, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Sidney B. Silverman, Esquire, (argued), New York, New York; and Walter Siegle, Esquire, Symbol Technologies, Inc., Attorneys for Plaintiff.

Henry E. Gallagher, Jr., Esquire, Connolly, Bove, Lodge & Hutz, LLP, Wilmington, Delaware; and Drew A. Carson, Esquire, (argued), Goodman, Weiss, Miller, LLP, Cleveland, Ohio, Attorneys for Defendants Bogomolny, Cribb, Goodman, Reddy, Brick and Rose.

Martin P. Tully, Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorneys for Defendant Meyerson.

### OPINION

LAMB, Vice Chancellor.

### I.

This action was filed as a derivative action on behalf of Telxon Corporation challenging an April 1996 stock option agreement between Telxon and its then board chairman, Robert F. Meyerson (the "Derivative Complaint"). The option agreement gave Meyerson the right to acquire 10% of the fully diluted equity of a valuable wholly owned subsidiary of Telxon and required Telxon to finance Meyer-

son's exercise of that option on a non-recourse basis. The Derivative Complaint named as defendants Meyerson and six others who were members of Telxon's board of directors during the relevant period of time (the "Non–Meyerson Directors").

In 2000, Telxon was acquired by Symbol Technologies, Inc. and continues to do business as a wholly owned subsidiary of Symbol. On May 10, 2001, Telxon (now controlled by Symbol) realigned itself as plaintiff and filed an Amended Complaint converting the derivative action to a direct action (the "Amended Complaint"). The Amended Complaint alleges, notably, that Telxon has no record that any of the Audit, Compensation, or Stock Option Committees of the Telxon Board of Directors kept minutes of any of their deliberations during the pertinent time and, in particular, that there is no record of the deliberations of the committee responsible for authorizing the 10% stock option at issue in this case.

The Non–Meyerson Directors have moved to dismiss the Amended Complaint on the grounds that it is barred by the applicable statute of limitations and fails to state a claim upon which relief may be granted. For the reasons that follow, I conclude that the derivative claim was timely filed in December 1999 and, thus, that the Amended Complaint, which relates back to that filing, is also timely. I also conclude that, in view of well-pleaded allegations of the Amended Complaint, I cannot determine with confidence that Telxon has failed to state a claim upon which relief may be granted.

## II.

On December 12, 1999, Merchants National Properties, Inc. brought a derivative action on behalf of Telxon alleging breach of fiduciary duties and corporate waste against the Telxon board as it existed during the 1997 fiscal year, which spanned the period between April 1996 and March 1997. Merchants had owned 1,000 shares of Telxon common stock since 1990. The complaint named as defendants Meyerson and Telxon directors Richard J. Bogomolny, Frank Brick, John H. Cribb, Robert A. Goodman, Raj Reddy, and Norton Rose. Brick and Cribb were salaried executives of Telxon who, it is alleged, reported directly to Meyerson. Goodman was the senior partner of a small law firm that represented Telxon, Meyerson, and other companies owned or controlled by Meyerson. Bogomolny, Reddy, and Rose were nominally outside directors who are claimed to have been beholden to Meyerson for the substantial and allegedly excessive fees and benefits they received in connection with their service as directors.[1]

Meyerson, the founder of Telxon, served as its chairman of the board of directors from 1979 to February 26, 1997. He served as Telxon's CEO from 1979 to 1985, and then again from October 1992 until February 26, 1997. Meyerson also served as a consultant to Telxon during a 1985–1992 hiatus from his CEO responsibilities. Meyerson's last employment contract with Telxon expired in March of 1996. Thereafter, Meyerson continued to serve at the pleasure of the board until he resigned all positions with Telxon on February 26, 1997.

At the time of Meyerson's resignation, he received a cash severance of $5,520,000. Prior to that, he had borrowed $1,150,000 from Telxon to meet his personal tax obli-

---

1. For the purposes of this Rule 12(b)(6) motion, the well-pleaded allegations of the complaint will be taken as true.

gations, and another $1,229,241.93 to purchase stock of Metanetics Corporation. The severance payments were not offset against those loans. The company's directors also granted 460,000 shares of Telxon stock to Meyerson. The complaint does not seek relief with respect to these severance payments but, nonetheless, alleges that they were all improper because Meyerson allegedly agreed in November 1992 to forego "stock options, restricted stock or severance." That agreement, which was never disclosed publicly, allegedly arose out of Telxon's $17.3 million purchase of a corporation from Meyerson and members of his family.

### The Aironet Option

Aironet was a provider of high-speed, standards-based, wireless local area network solutions. Telxon formed Aironet in 1993 by combining two of its operating units with a company that had recently been purchased by it. Aironet was, until March of 1997, a wholly owned subsidiary of Telxon.

In August of 1995, Telxon announced a program called "Telxon 2000" which was designed to allow key employees to purchase shares of Telxon subsidiaries at fair market value as determined by outside experts. The complaint alleges that:

The Telxon subsidiaries eligible for grants under Telxon 2000 were those which had been acquired from others. The purpose of Telxon 2000 was to provide employees whose efforts were responsible for the acquisition with a risk-reward incentive. Telxon's 1997 Proxy Statement ... described the "incentive

opportunity" created by the program as "long-term," and stated that it was designed to encourage the employees receiving it to support the development of the subsidiaries and their businesses with the same effort and dedication as in their service to Telxon, "thereby more closely aligning their objectives with the long-term goals of the Company as a whole."

The Amended Complaint alleges that, on or about April 11, 1996, the Stock Option Committee [2] (composed of Goodman and Rose) awarded Meyerson an option to purchase from Telxon, at $1.86 per share, 808,500 shares of Aironet, representing a 10% interest in Aironet (the "Aironet Option").[3] Meyerson assigned this option to a company controlled by him and exercised it in full by contract dated March 31, 1997. In accordance with the terms of the Aironet Option, Meyerson paid the purchase price of the shares by delivering a nonrecourse note to Telxon. Thus, the complaint alleges, Meyerson took no risk when he exercised the option because, if Aironet failed, Meyerson would merely redeliver the shares to Telxon and have no further liability on the note. The complaint alleges that this arrangement "from Telxon's perspective was devoid of business purpose and constituted an extraordinarily unusual transaction for a public company."

The disclosure of the Aironet Option to Telxon shareholders was made in the 1997 Proxy Statement and cast the option grant as a part of the "Telxon 2000" program. The Amended Complaint alleges that this disclosure was false and misleading because, it claims, the Aironet Option was

---

**2.** The complaint also alleges that a note found in Telxon's files, but not contemporaneously prepared, reflects that the Aironet Option was authorized by the Compensation Committee, although the complaint suggests that this note was in error.

**3.** The Aironet Option also gave Meyerson an anti-dilution right that allowed him to buy additional shares in order to maintain his 10% equity interest, pursuant to which Meyerson received an additional 120,635 shares and 29,524 warrants to purchase shares.

not made in accordance with the terms of Telxon 2000, but in violation of it.

On July 30, 1999, Aironet made a public offering of its shares at a price of $11 per share. On November 9, 1999, Cisco Systems, Inc. announced that Aironet would be merged into Cisco and each share of Aironet common stock would be exchanged for 0.637 shares of Cisco common stock. On the date the Cisco–Aironet merger closed, Cisco's stock closed at $128.63, making each share of Aironet worth about $82 and the 958,659 shares of Aironet stock Meyerson and his affiliates had purchased worth about $78.6 million.

### The Non–Meyerson Directors

Cribb and Brick were both salaried executives with Telxon. Brick became President of Telxon in June 1996, having previously served in other positions at the corporation. He became a Telxon director on July 17, 1996. Brick was previously employed by Basicomputer Corporation, a company founded by and affiliated with Meyerson. The Amended Complaint alleges that Cribb and Brick reported directly to Meyerson, that their positions at Telxon were important to them, and that both were financially dependent on their salaries.

Goodman is alleged to be the senior partner of a "small law firm that was selected by Meyerson in 1979 as Telxon's principal lawyers." During fiscal year 1997, Goodman's firm is alleged to have received fees from Telxon of $2,780,220. The complaint alleges that Telxon was, by far, Goodman's firm's most important client and that the fees paid by Telxon were material to Goodman. Goodman's firm also represented Meyerson personally and other companies owned or controlled by him. Goodman also received $118,750 cash compensation for serving as an outside director of Telxon in fiscal year 1997.

In addition, Goodman received 25,000 options on joining the board and 10,000 options annually thereafter.

Rose received $119,500 in cash compensation for serving as an outside director of Telxon in fiscal year 1997. Moreover, the complaint alleges that Meyerson caused Telxon to hire Rose as a consultant at a rate of $3,500 per day and that, in fiscal year 1997, Rose received $157,500 in consulting fees from Telxon. The consulting agreement under which these services were rendered further called for Rose to receive an additional $150,000 at the conclusion of the engagement. The complaint also alleges that Meyerson selected a travel agency with which Rose is affiliated as Telxon's exclusive agency and that, in a ten month period during fiscal year 1997, that agency received $167,926 in business from Telxon. In addition, like the other outside directors, Rose received 25,000 options on joining the board and 10,000 annually thereafter. On the basis of these factual allegations, the Amended Complaint alleges that Goodman and Rose were "beholden to defendant Meyerson for the lavish fees and benefits he caused Telxon to bestow on them [and a]s a consequence, ... were unable to exercise independent judgment on matters in which Meyerson was personally interested, in particular the wrongs complained of herein."

Reddy received $119,500 in cash compensation in fiscal year 1997 for serving as an outside director of Telxon. He also received 25,000 options on joining the board and 10,000 annually thereafter. Reddy was also the chairman of the Aironet board and, in that capacity, reported directly to Meyerson. The Amended Complaint alleges that, in that capacity, Reddy received substantial benefits that were material to him. As an example, it is alleged that, on July 17, 1996, some four months after the Aironet Option, "Meyer-

son caused Goodman to place on the agenda a proposal, which Meyerson seconded, to grant Reddy an option on 30,000 shares of Aironet stock at a strike price of $1.86 per share." The complaint further alleges that this option was priced far below the fair market value of the Aironet shares and that, by March 15, 2000, as a result of the acquisition of Aironet by Cisco Systems, Inc., the optioned shares were worth $82 per share. On the basis of these allegations, the Amended Complaint alleges that Reddy "was subservient to Meyerson and unable to exercise independent judgment in connection with the matters complained of herein."

Bogomolny, as a non-employee director, received $116,250 in fiscal year 1997 for serving on the Telxon board and various of its committees. Bogomolny was also entitled to 25,000 options in Telxon's stock upon joining the board, and 10,000 options annually thereafter. The Amended Complaint does not allege that Bogomolny was unable to exercise an independent judgment about Meyerson's compensation.

### The Claims [4]

The Amended Complaint alleges that the grant of the Aironet Option to Meyerson was a "wrongful, unlawful, and *ultra vires* act and a waste of Telxon's assets for" a variety of reasons. First, the complaint alleges that the Aironet Option was not approved by the Telxon board of directors, but by Goodman and Rose, who were, allegedly, not independent of Meyerson's influence. Next, the complaint alleges that the 1997 proxy statement disclosure misrepresented that the Aironet Option was granted as a part of the Telxon 2000 option plan. Third, the complaint alleges that the Aironet Option was im-

proper in light of Meyerson's November 1992 agreement to forego "stock options, restricted stock or compensation." Fourth, the complaint claims that Goodman and Rose breached their duties of loyalty and care in awarding the Aironet Option, and that the other directors "likewise violated their duty of loyalty to Telxon by permitting Meyerson to reap the benefits of the Aironet Option when they knew or should have known that the Aironet Option was wrongful and unlawful for the reasons set forth above." Finally, the complaint charges that the anti-dilution feature of the Aironet Option was not supported by consideration and was a waste of corporate assets.

### The Motions to Dismiss

On March 8 and April 10, 2000, defendants moved to dismiss the Derivative Complaint, or for judgment on the pleadings, on grounds, among others, that Merchants had failed to meet the pleading requirements of Rule 23.1. The briefing on those motions was never completed, nor were the motions submitted to the court for decision. On November 20, 2000, Telxon was acquired by Symbol. On May 10, 2001, Telxon filed the Amended Complaint "in full substitution for the Derivative Complaint filed on December 30, 1999."

Where the original complaint called for rescission of the Aironet Option, the Amended Complaint calls for Meyerson and Telantis V to account to Telxon for the difference, plus interest, between the price paid by them for all Aironet stock and the highest intermediate fair market price of Aironet stock up to and including the closing of the merger with Cisco. Further, plaintiffs request attorneys fees and a gen-

---

**4.** The original Derivative Claim contained a second count alleging that funds expended by the Telxon board in resisting an earlier unsolicited Symbol bid for the company were a waste of Telxon's assets and were directed primarily at entrenching the directors in their highly paid board positions. This claim has been dropped in the Amended Complaint.

eral accounting to Telxon by defendants for the alleged wrongs complained of.

On June 29, 2001, attorneys representing the Non–Meyerson Directors filed a motion to dismiss the Amended Complaint. The Non–Meyerson Directors base their motion to dismiss on the grounds that the Amended Complaint (1) is barred by the applicable statute of limitations, and (2) fails to state a claim for which relief may be granted.

### III.

I first turn to the issue of whether the Amended Complaint is time barred and the reasons why I find that it is not.

■ The first question is whether the Amended Complaint properly relates back under Rule 15 to the date of filing of the original Derivative Complaint, December 30, 1999.[5] Rule 15 provides that "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim ... in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading ...."[6] The crucial consideration is whether a defendant had notice from the original pleadings that the plaintiff's new claim might be asserted against him.[7]

■ This is an easy case under Rule 15 because both the initial and the amended complaints relate to the same transaction: the sale of 10% of Aironet by Telxon to Meyerson. The factual allegations in the two complaints are slightly different, but those differences reflect only a greater access to information at the time of the Amended Complaint. For example, the initial complaint alleged that the sale of Aironet shares to Meyerson took place "[s]ometime in fiscal year 1997, and [was] effective sometime in March 1997." The Amended Complaint recognizes that the decision to grant the option took place in April 1996 and the actual sale in March 1997. The Amended Complaint also alleges that the initial decision to grant the option was not made by the entire board of directors, but by Goodman and Rose acting as the Stock Option Committee. These are minor differences that have no bearing on my analysis under Rule 15(c).

■ The next question is whether the claim asserted in the Amended Complaint was time barred on December 30, 1999. All parties recognize that December 1999 was more than three years after the decision to award the Aironet Option in April 1996. In *Kahn v. Seaboard*,[8] after an exhaustive review of pertinent authority, Chancellor Allen recognized "the soundness of the principle that the statute of limitations applies, but is tolled in derivative actions charging actionable self-dealing, until the shareholders knew or had reason to know of the facts constituting

---

**5.** The defendants make a strained argument that Rule 15 does not apply to the Amended Complaint either because, they say, Telxon was not a "party" to the action before the amendment or because the complaint was not *its* pleading. Of course, Telxon *was* a party to the action. Moreover, while it did not file the initial complaint, that pleading was filed derivatively on its behalf. Thus, I reject the suggestion that Telxon was not entitled to realign itself as a party plaintiff and then move to amend the complaint in accordance with Rule 15.

**6.** Del. Ct. Ch. R. 15(c); *Gluck v. Chashin*, Del.Supr., 210 A.2d 855 (1965).

**7.** *Atlantis Plastics Corp. v. Sammons*, Del. Ch., 558 A.2d 1062, 1065 (1988); 6A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:* Civil § 1497.

**8.** Del. Ch., 625 A.2d 269 (1993).

the alleged wrong."[9] If this principle applies to the filing of the Amended Complaint, the action was timely brought, since the first public announcement of the grant of the Aironet Option took place in June 1997, less than three years before the filing of the initial complaint in this matter. If it does not, no other ground to toll the operation of the limitations period has been adequately alleged and the complaint should be dismissed.

The original Derivative Complaint charged actionable self-dealing by corporate fiduciaries and neatly fit the principle explained in *Kahn v. Seaboard.* Thus, there is little reason to doubt that the Derivative Complaint was timely filed. Indeed, defendants spend little effort arguing otherwise. Instead, they urge that the operative principle of equitable tolling applies only to the original derivative action and that the timeliness of the current direct action must be assessed without regard to whether or not the initial Derivative Complaint was timely filed. They further contend that no other principle on which to toll the operation of the statute of limitations, such as fraudulent concealment, is adequately pleaded in the Amended Complaint.

■ These arguments are based on an artificial premise that the Amended Complaint asserts a different claim than the Derivative Complaint. On the contrary, both the derivative action and the direct action belong to the corporation and are prosecuted on its behalf.[10] Even when demand is properly excused, the board of directors retains the inherent power to manage derivative claims when, for example, a new disinterested majority is elected[11] or when a special litigation committee appointed by the board decides to dismiss or settle such litigation.[12]

■ It would create an unwarranted interference with the inherent power of boards of directors and lead to anomalous results if this court were to conclude that a timely filed derivative claim was time barred in the hands of a board of directors choosing to realign its interest to assert control of the litigation. Rather, the power of the board of directors has to be at least as broad as the power of a stockholder plaintiff to proceed derivatively in the name of the corporation.

For these reasons, I conclude that because the Derivative Complaint was filed within three years of the first public disclosure of the Aironet Option, both it and the Amended Complaint were timely filed.

## IV.

■ I next turn to the motion to dismiss made pursuant to Rule 12(b)(6). "[W]hen evaluating a motion to dismiss for failure to state a claim, the truthfulness of all well-pleaded allegations in the complaint is to be assumed."[13] Further, the plaintiff is entitled to all reasonable inferences that can be drawn from the com-

---

9. *Id.* at 276–77.

10. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984).

11. As was observed in *Harris v. Carter,* Del. Ch., 582 A.2d 222, 231 (1990), a new board majority has the power to take control of pending derivative litigation and to move to dismiss the litigation as not in the best interests of the corporation.

12. *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779, 788 (1981).

13. *Solomon v. Pathe Communications Corp.,* Del.Supr., 672 A.2d 35, 38 (1996) (citing *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988)).

plaint.[14] "However, '[c]onclusions ... will not be accepted as true without specific allegations of fact to support them.'"[15] The motion to dismiss will be denied unless it appears with "reasonable certainty" that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[16]

■ This standard is notably lower than is true in the context of motions to dismiss for failure to make a presuit demand. As the Delaware Supreme Court stated in *Brehm v. Eisner*, "[Rule 23.1] pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleading."[17] The difference in pleading standards is particularly important in this case since the vitality of Telxon's claim depends largely on the assertion that the outside directors of the company who approved the Aironet Option were unable to exercise judgment in that matter free of Meyerson's influence. If this were a motion to dismiss under Rule 23.1, the complaint would have to meet the high burden of pleading with particularity facts supporting the reasonableness of that assertion.[18] In the context of this motion to dismiss under Rule 12(b)(6), however, the burden is somewhat lower.

## A. The Breach of Fiduciary Duty Claim

■ I turn first to the claim that the issuance of the Aironet Option and the subsequent decision to approve the Stock Purchase Agreement and financing of Meyerson's exercise of that option amounted to a breach of the Telxon directors' fiduciary duties of loyalty and care.[19] I conclude that the Amended Complaint states a claim for relief because it alleges facts that, if true, could support the inference that none of the defendants, other than Bogomolny, was able to act independently of Meyerson and that the terms of the Aironet Option and the Stock Purchase Agreement were unfair to Telxon.[20]

Cribb and Brick were employed by Telxon as executive officers and reported to Meyerson. That is enough to support an inference, at this stage of the proceedings, that they could not act independently of Meyerson.[21]

Goodman is alleged both to have received excessive compensation for his service as a director and to have been beholden to Meyerson on account of the large legal fees earned by Goodman's law firm from Telxon, Meyerson, and entities owned or controlled by Meyerson. In the context of this motion, those allegations are sufficient to survive this motion to dismiss as to him.[22]

**14.** *Id.* (citing *In re USACafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 47 (1991)).

**15.** *Id.* (quoting *In re Tri–Star Pictures, Inc. Litig.*, Del.Supr., 634 A.2d 319, 326 (1995)).

**16.** *Id.* (citing *In re USACafes*, 600 A.2d at 47; *Rabkin v. Philip A. Hunt Chem. Corp.*, Del. Supr., 498 A.2d 1099, 1104 (1985)).

**17.** Del.Supr., 746 A.2d 244, 254 (2000).

**18.** *Brehm*, 746 A.2d at 254.

**19.** There is no mention in defendants' brief of the § 102(b)(7) exculpatory charter provisions limiting directors' liability in the Telxon cer-

tificate of incorporation. I presume, at the appropriate time, defendants will raise the issue and do not intend that anything in this decision should limit their ability to do so.

**20.** The Amended Complaint does not allege, even conclusorily, that Bogomolny was beholden to Meyerson. Thus, I will dismiss the duty of loyalty claim alleged as to him.

**21.** *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 936 (1993).

**22.** *Steiner v. Meyerson*, 1995 WL 441999, *9–*10, 1995 Del. Ch. LEXIS 95, at 28–29, Allen, C. (July 18, 1995); *In re Ply Gem Indus.*

Similarly, the allegations of fact relating to the relatively large amount of compensation paid by Telxon to Rose in 1997 (and Meyerson's alleged involvement in those payments) could suffice to overcome the usual presumption that outside directors act in good faith and in the best interests of the corporation they serve.[23] Those allegations are sufficient to survive the motion to dismiss.

I am also unwilling to conclude at this stage that the Amended Complaint does not adequately allege a claim against Reddy. Although the amount of cash compensation alleged to have been paid to him in 1997 is less than that alleged of the other defendants, the Amended Complaint does allege that, in July 1996, Meyerson arranged for an award of Aironet options to Reddy on favorable terms. The complaint also alleges that the cash compensation for his service as a director was excessive and that Meyerson was responsible for it. Ultimately, these are matters of fact that plaintiff will have to establish at trial. For present purposes, however, the allegations are enough to survive the motion to dismiss.

Reddy points to a recent decision by Vice Chancellor Jacobs finding that Reddy was independent of Meyerson's control.[24] Relying on *Grobow v. Perot* and *In re Walt Disney Co. Derivative Litig.*, the court there found the combined annual directors and consulting fees paid by Telxon to Reddy in fiscal years 1991 to 1993 of $25,000 to be insufficient as both a matter of law and fact to challenge his independence from Meyerson and granted summary judgment on the issue. The factual allegations in the Amended Complaint are sufficiently distin-

guishable to preclude me from according binding precedential effect to this decision. For example, the Amended Complaint alleges that Reddy received more than $119,500 cash compensation in fiscal year 1997 and further received valuable options to acquire Aironet stock that ultimately were worth more than $2 million. These factual claims require further exploration.

Finally, my decision to deny the motion to dismiss is influenced by the allegation in the Amended Complaint that there were no minutes kept of the meetings of the Telxon board committees. If the facts ultimately establish, as alleged, that there were no minutes kept recording the deliberations of the Stock Option Committee (or, alternatively, the Compensation Committee) in relation to the approval of the option to acquire 10% of the Aironet stock, that fact could substantially influence the ultimate conclusions about the loyalty and good faith of the directors making that decision. Similarly, if the facts show that the other board committees, which are alleged to have met numerous times over the course of fiscal year 1997, failed to maintain any record of their activities, it is more likely that the allegations of excessive compensation will be established.

## B. The Corporate Waste Claim

■■■■ I turn next to the issue of corporate waste. Waste is an extremely difficult claim to prove: "the waste theory represents a theoretical exception ... very rarely encountered in the world of real transactions. There surely are cases of fraud; of unfair self-dealing and, much more rarely negligence. But rarest of

---

*S'holders Litig.*, 2001 WL 755133, *9, 2001 Del. Ch. LEXIS 84, *32, Noble, V.C. (June 26, 2001).

**23.** *Aronson*, 473 A.2d at 812.

**24.** *Merchants Nat'l Props., Inc. v. Meyerson*, Del. Ch., C.A. No. 13139, Jacobs, V.C. (July 24, 2000), 2000 WL 1041229, 2000 Del. Ch. LEXIS 109.

all—and indeed, like Nessie, possibly non-existent—would be the case of disinterested business people making non-fraudulent deals (non-negligently) that meet the legal standard of waste!"[25] Moreover, Delaware law enables corporations to create and issue rights or options which allow the holders thereof to purchase shares in the corporation.[26] The power to issue stock options rests with the board, and, "[i]n the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive."[27] The fundamental requirements against which the decision by the directors of a corporation to issue stock options will be examined are (1) whether the corporation may reasonably expect to receive the contemplated benefit from the grant of the options and (2) whether there is a reasonable relationship between the value of the options granted and the value of the benefits passing to the corporation.[28]

■ In the context of this motion to dismiss, the issue becomes whether the particularized factual allegations of the complaint create a doubt that reasonable directors could have expected the corporation to benefit from the grant of the Aironet Option.[29] A transaction will be only deemed a waste when the consideration received for corporate assets is "so disproportionately small as to lie beyond the range at which a reasonable person might be willing to trade."[30]

■ I cannot conclude, based on the well-pleaded allegations of the Amended Complaint, that no set of facts could be shown that would permit the court to conclude that the Aironet Option constituted an exchange to which no reasonable person not acting under compulsion and in good faith could agree. In so concluding, I mean to suggest only that the terms and circumstances of the Aironet Option appear at this point sufficiently unusual to require the court to allow the claim to survive beyond the pleading stage. Thus, for that reason the motion to dismiss will be denied.

## V.

For all the foregoing reasons, the motion to dismiss is denied except that the claim against defendant Bogomolny for breach of the fiduciary duty of loyalty is dismissed.

25. *Steiner v. Meyerson*, 1995 WL 441999, *4–*5, 1995 Del. Ch. LEXIS 95, at *13–*14, Allen, C. (Aug. 16, 1995).

26. 8 *Del. C.* § 157.

27. *Id.*

28. *Olson Bros. v. Englehart*, Del.Supr., 245 A.2d 166 (1968).

29. *Zupnick v. Goizueta*, Del. Ch., 698 A.2d 384 (1997).

30. *Lewis v. Vogelstein*, Del. Ch., 699 A.2d 327, 335–36 (1997); *see Zupnick*, 698 A.2d 384 (finding that a stock option grant did not constitute waste when directors concluded that the officer's past services were extraordinary and unusual in character and had led to great gains and profits on behalf of the corporation).