In the Matter of TEU HOLDINGS, INC, et al., Debtors.

The Official Committee Of Unsecured Creditors of Teu Holdings, Inc., This End Up Furniture Co., et al., Plaintiffs,

v.

Robert A. Kemeny, James A. Wall, Saleem Muqaddam, Robert George, James Vangilder, Charles Coppening Caroline S. Hipple, R. Dixon Bartlett, III, Robert Lynn Brandon, Jeffrey L. Thomas, Anita M. Pugh, Hygrade Distribution and Delivery Systems Inc., and Hygrade Integrated Logistics Systems, Inc., Defendants.

Bankruptcy No. 00–1098 (RJN).
Adversary No. 02–1970 (RJN).

United States Bankruptcy Court, D. Delaware.

Nov. 1, 2002.

Jon E. Abramczyk, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Lawrence J. Slattery, Cora M. Jones, Morgan, Lewis & Bockius, LLP, New York City, for Muqaddam, George, Vangilder, Corpening, Hipple, Bartlett, Thomas and Pugh.

Adam Hiller, Wilmer C. Bettinger, Pepper Hamilton, LLP, Wilmington, DE, Jonathan L. Hauser, Troutman Sanders, LLP, Norfolk, VA, for James Wall.

William P. Bowden, Ricardo Palacio, Ashbey & Geddes, Wilmington, DE, Norman N. Kinel, Melissa Zelen Neier, Sidley, Austin, Brown & Wood, LLP, New York City, for the Official Committee of Unsecured Creditors.

Bonnie Glantz Fatell, Dale R. Dube, Blank, Rome, Comisky & McCauley, LLP, Wilmington, DE, Jonathan Thau, Frank E. DeGrim, Gladys Xiques, Luboja & Thau, LLP, New York City, for Hygrade Integrated Logistics Systems, Inc. and Hygrade Distribution and Delivery Systems, Inc.

Mark E. Felger, Jennifer Lee Scoliard, Cozen & O'Connor, Wilmington, DE, for the Debtors.

Frank Perch, Wilmington, DE, Office of the United States Trustee.

## MEMORANDUM OPINION

RANDALL J. NEWSOME, Bankruptcy Judge.

### I. BACKGROUND

On February 17, 2000, the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors remain as debtors-in-possession pursuant to 11 U.S.C. § 1107 and 1108 of the Bankruptcy Code.[1] The Debtors have ceased operations and are currently in the process of liquidating their assets for the benefit of their creditors. On March 2, 2000, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors to represent all unsecured creditors of the Debtors, pursuant to § 1102. TEU Holdings, Inc. ("TEU Holdings"), This End Up Furniture, Inc. ("The Furniture Company"), and This End Up, Inc. ("TEU Inc."), are essentially the Debtors and will be collec-

---

1. All statutory references herein are to the Bankruptcy Codes, 11 U.S.C. § 101 *et seq.*, unless otherwise noted.

tively referred to as TEU for purposes of this memorandum.

TEU, founded in 1974, was a vertically integrated manufacturer and retailer of furniture, bedding, and accessories for residential, commercial, and institutional customers. TEU's primary product lines included the Pine This End Up and the Wood's End Lines, the fully upholstered Lifestyle Collection, and the Home Fashion Collection of made-to-order products. During the period of 1997 through 1999, TEU operated approximately 146 retail stores, 8 distribution centers, 2 cross docks, and 4 manufacturing facilities, primarily located on the East Coast. At its peak, TEU operated over 250 stores as well as a direct mail catalog. The manufacturing and distribution facilities were located in North Carolina and Virginia.

The Committee filed this adversary proceeding on February 15, 2002, pursuant to an Order authorizing the Committee to pursue avoidance actions.[2] The Committee has brought three categories of claims against the various Defendants: 1) Breach of the duty of care and avoidance of certain payments against Robert A. Kemeny and James A. Wall; 2) Breach of contract and negligence against Hygrade Distribution and Delivery Systems, Inc. ("HDDS") and Hygrade Integrated Logistics Systems, Inc. ("HILS") (collectively for factual purposes, "Hygrade"); and 3) Breach of fiduciary duty and corporate waste against all of the individual Defendants.

Presently before the Court are four motions. First, Defendants Saleem Muqaddam, Robert George, James Vangilder,

Charles Corpening, Caroline S. Hipple, R. Dixon Bartlett, III, Jeffrey L. Thomas, and Anita M. Pugh move to dismiss Plaintiff's Fourth and Fifth Claims for Relief as set forth in the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012. Second, Defendant James A. Wall moves separately to dismiss the Fourth and Fifth Claims for Relief as set forth in the Complaint pursuant to Fed. R.Civ.P. 12(b)(6) and Fed. R. Bankr.P. 7012. Third, Defendant HDDS moves to dismiss all claims asserted by the Plaintiff pursuant to Fed. R. Bankr.P. 7012 and Fed.R.Civ.P. 12(b)(6). Lastly, Defendant HILS moves pursuant to Fed. R. Bankr.P. 7007 and Fed.R.Civ.P. 7(b) for an order to enforce the arbitration provisions of the underlying contracts between HILS and Debtors TEU and/or Our Delivery Service, LLC, and to stay litigation as to the claims asserted against HILS, pending arbitration, pursuant to the United States Arbitration Act 9 U.S.C. §§ 1 *et seq.*

On May 5, 2002, the Court entered an Order Establishing a Briefing Schedule and setting the matters for hearing [Doc. No. 16].

### A. The Individual D & O Defendants

The individual Defendants were directors and/or officers of various TEU entities. At times, they held the following positions:

**TEU Holdings**

| | Directors | Officers |
|---|---|---|
| | Kemeny | Kemeny (President/CEO) |
| | Muqaddam | Wall |
| | George | Corpening |
| | Vangilder | Thomas |

---

**2.** The "Order Authorizing the Official Committee of Unsecured Creditors to Pursue Avoidance Actions," dated January 18, 2002, provides, in relevant part, as follows:

[T]he Committee be and hereby is authorized and possesses the requisite standing to pursue ... any causes of action under the Bankruptcy Code or other applicable non-bankruptcy law that the Committee determines to pursue against present or former officers and directors of the Debtors ...

(Case No. 1098, Doc. No. 1646).

Corpening

**TEU, Inc.**

| | Directors | Officers |
|---|---|---|
| | Kemeny | Kemeny (President/CEO) |
| | Thomas | Wall |
| | Pugh | Thomas |

| Furniture | Directors | Officers |
|---|---|---|
| | Kemeny | Kemeny (President/CEO) |
| | Thomas | Wall (VP & Controller) |
| | Pugh | Hipple |
| | | Thomas |
| | | Pugh |
| | | Bartlett |
| | | Brandon |

## B. The Competing Business Operated By Defendants Kemeny and Wall

The Committee alleges that beginning on or before January 1997, and continuing through May 1999, Kemeny, with substantial assistance from Wall, secretly incorporated and operated I.M.S., LLC ("IMS"), a furniture business that sold cocktail tables and possibly other furniture products that competed, or were intended to compete, with products sold by TEU. It is alleged that Kemeny, with substantial assistance from Wall, operated IMS for his personal benefit using significant TEU assets and resources. Neither Kemeny nor Wall disclosed their operation and development of the IMS business to TEU.

A vast part of the allegations asserted by the Committee in its Complaint are drawn from the affidavit of Leonard Karden. In 1996, Kemeny approached Karden, who was then Vice–President of Marketing for Duncan & Lewis ("D & L"), a subsidiary of Debtor The Furniture Company, and urged him, purportedly on behalf of TEU, to relocate from California to North Carolina to conduct D & L business on behalf of TEU. Kemeny and Karden also discussed forming a company to develop a line of furniture, independent of TEU or D & L, even though each would remain employees of their respective companies. Karden agreed to move to North Carolina, purportedly without any knowledge of the IMS business assuming that the move had been authorized by TEU. Kemeny and

Wall instructed Karden that it was important that he not tell anyone that either of them was involved in the IMS venture.

The Complaint sets forth a specific transaction between IMS and Klaussner Furniture Industries ("KFI"), wherein KFI ordered from IMS 9,000 wooden tables to be imported from China for $1.6 million. In order to complete the transaction, numerous expenses are alleged to have been paid ultimately by TEU, including Kemeny's travel to China. In addition, the Committee alleges that Kemeny arranged for TEU to pay Karden a consulting fee for the IMS work in addition to Kemeny and Walls' salaries.

## C. TEU Overhauls and Outsources Its Distribution and Logistics

In 1997 TEU executives determined that TEU needed to overhaul its distribution and logistics system so as to improve the way it delivered merchandise to customers. Kemeny, as President and CEO, decided to build a distribution center in North Carolina to house all of TEU's inventory, rather than continue with TEU's regional warehouse inventory storage system. Kemeny decided to hire an outside company to handle all of TEU's distribution and logistics needs. There are indications that the decision to bring in an outside company was not supported by all of the management members. The overhaul TEU was undertaking at this time also required a complete upgrade of its computer systems. TEU selected Hygrade as the potential vendor to undertake the work for TEU.

In furtherance of these plans, in 1997 TEU organized a Steering Committee and charged it with the responsibility for conducting due diligence to determine whether Hygrade was able to perform the services contemplated by TEU. After completing its due diligence on Hygrade,

the Steering Committee determined that Hygrade was not sufficiently qualified to satisfy TEU's distribution and logistics needs. Wall, the Steering Committee's chair informed Hygrade of the decision and terminated TEU's relationship with Hygrade. Shortly thereafter, however, Kemeny reversed the Steering Committee's decision and re-hired Hygrade.

The Plaintiff Committee asserts that the decision to make the distribution and logistics changes was a crucial and integral part of TEU's overall business. Therefore, the Committee asserts that, in the exercise of ordinary care, the Director and Officer Defendants should have been informed about the basis of these decisions and learned about the qualifications of the chosen vendor, Hygrade, before approving, acquiescing, and/or ratifying the decision to hire Hygrade.

In March 1998, TEU completed a 220,000 square foot Centralized Distribution Center ("CDC") in Benson, North Carolina. All inventory would be shipped daily from the CDC to "cross docks" or "X–Docks", which were the former regional distribution centers. The cross docks would carry minimal inventory. All customer orders would then be shipped from the cross docks. Also in March 1998, Hygrade began delivering the integrated logistics system and providing management services to TEU.

TEU expected that the overhaul would decrease finished goods inventory by $5 million, reduce TEU's open order backlog of undelivered orders by $5 million, and improve delivery errors and delivery cycle time from a then 6–8 week average to 2–4 weeks.

Plaintiffs allege that the actual result was, in short, an utter failure. Hygrade's systems allegedly failed to operate and were incapable of carrying out the functions required by TEU.

## II. DISCUSSION

### A. FRCP 12(b)(6) Standard

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7012, is to test the legal sufficiency of the complaint. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987). "A complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief' … such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002), *quoting, Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Federal Rules require notice pleading rather than fact pleading.

When considering a Rule 12(b)(6) motion, the trial court is "required to accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997), *citing, Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989), *D.P. Enter., Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984). A Rule 12(b)(6) motion should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse*, 132 F.3d at 906. But a court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Id., citing, In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1429–30 (3d Cir. 1997).

The pertinent inquiry on a motion to dismiss pursuant to Rule 12(b)(6) "is not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Orr v. Bernstein (In re Bernstein),* 259 B.R. 555, 556 (Bankr.D.N.J.2001). "In addition to these expansive parameters, the threshold a plaintiff must meet to satisfy pleading requirements is exceedingly low; a court may dismiss a complaint only if the [P]laintiff can prove no set of facts that would entitle him to relief." *Edwards v. Wyatt,* 266 B.R. 64, 71 (E.D.Pa.2001), *citing, Conley v. Gibson,* 355 U.S. 41, 45–46 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

As a preliminary matter, the Court notes that "the applicable law governing the liability of officers and directors for their stewardship of the corporation is the law of the jurisdiction of incorporation." *Resolution Trust Corp. v. Cityfed Financial Corp.,* 57 F.3d 1231, 1236 n. 5 (3d Cir.1995) (vacated on other grounds), *citing, Resolution Trust Corp. v. Chapman,* 29 F.3d 1120, 1122 (7th Cir.) (reaching this conclusion under the "venerable choice-of-law principle known as the internal affairs doctrine"). In this case, TEU is incorporated in Delaware so for purposes of disposing of the motions to dismiss, the Court will apply Delaware law.

## B. The D & O Defendants' Motion to Dismiss Plaintiff's Fourth and Fifth Claims For Relief [3]

### i. Breach of Fiduciary Duty By the D & O Defendants

To state a claim for breach of fiduciary duty, a complaint must allege facts from which one could reasonably conclude "that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty—good

faith, loyalty or due care." *Kahn v. Dairy Mart Convenience Stores,* C.A. No. 12489, 1994 WL 89010, *2 (Del.Ch. March 1, 1994), quoting, Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 361 (Del.1993). Furthermore, gross negligence is the applicable legal standard for a corporate director's breach of the duty of care under Delaware law. *Brehm v. Eisner,* 746 A.2d 244, 259 (Del.2000). Thus, "[i]n making business decisions, directors must consider all material information reasonably available, and the directors' process is actionable only if grossly negligent." *Id.; See also In re The Limited, Inc. Shareholders Litig.,* C.A. No. 17148–NC, 2002 WL 537692, *10 n. 64 (Del.Ch. March 27, 2002).

The Plaintiff's Complaint alleges, in relevant part as follows:

116. As officers and directors of The Furniture Company, TEU Inc. And TEU Holdings, the Director Defendants and the Officer Defendants each owed these entities and their shareholders the highest duties of loyalty, honest, and care in conducting their affairs.

117. As officers and directors of The Furniture Company, TEU Inc. And TEU Holdings, the Director Defendants and Officer Defendants had an obligation to discharge their duties to The Furniture Company, TEU Inc. and TEU Holdings in good faith and with the diligence, care, and skill that an ordinarily prudent person would exercise in similar circumstances.

118. The Director Defendants and the Officer Defendants also owed a duty to The Furniture Company, TEU Inc. and TEU Holdings, to keep informed and to act with due care in the management, operation, and supervision of the Furniture Company, TEU Inc. and TEU

---

**3.** As previously stated, Defendants Kemeny, Wall, and Brandon are excluded from this motion. Although Defendant Wall filed a separate motion to dismiss, his motion will be considered in this section.

Holdings. To discharge these duties, the Director Defendants and Officer Defendants were required to, among other things, be and remain informed as to how The Furniture Company, TEU Inc. and TEU Holdings were operating and upon receiving notice or information of an imprudent, questionable, or unsound decision or condition, to make reasonable inquiry and, if necessary, take reasonable action to remedy the situation. . . .

120. Upon information and belief, *the Director Defendants failed to make reasonable inquiry and failed to make a reasonably informed decision* with respect to Kemeny's decision to outsource TEU's distribution and logistics system to Hygrade. Rather, *the Director Defendants and the Officer Defendants acquiesced and ratified, without reasonable inquiry,* Kemeny's decision, despite the Steering Committee's conclusion that Hygrade was not qualified to handle such a huge undertaking. . . .

123. As a result of the foregoing knowing, intentional, *grossly negligent,* and/or reckless conduct, *the Director Defendants and the Officer Defendants mismanaged TEU's assets and failed to monitor and to oversee the execution of the decision to outsource distribution and logistics to Hygrade.*

124. *The Director Defendants and the Officer Defendants,* by their knowing, intentional, *grossly negligent,* and/or reckless misconduct, *caused The Furniture Company, TEU Inc. and TEU Holdings to waste their assets, expend massive corporate funds, and suffer great losses.*

125. Upon information and belief, and based on the foregoing, *the Director Defendants and the Officer Defendants mismanaged The Furniture Company, TEU Inc. and TEU Holdings and*

*breached their duty of care as directors and officers by, inter alia, (a) failing to make informed decisions and to act in the best interest of the Furniture Company, TEU Inc. and TEU Holdings; (b) mismanaging The Furniture Company, TEU Inc. and TEU Holdings or acquiescing in their mismanagement and operation other than in the best interest of The Furniture Company, TEU Inc. and TEU Holdings; (c) failing, in response to defendant Kemeny's reversal of the Steering Committee's decision not to hire Hygrade, to do anything except rubber-stamp defendant Kemeny's unilateral decision to re-hire Hygrade; and (d) failing to monitor and oversee the execution and implementation of the decision to outsource TEU's distribution and logistics to Hygrade.*

[Complaint at ¶¶ 116–125 (Doc. No. 1)] (emphasis added).

The Defendants argue in their briefs that "[f]iduciaries *are not liable* under such a claim even when, after the fact, their decision seems clearly wrong in any degree ranging from 'stupid' to 'egregious' " by citing *In re Caremark Int'l, Inc.,* 698 A.2d 959, 967 (Del.Ch.1996) [Doc. No. 5, at 7] (emphasis added). The question is whether the process employed was "either rational or employed in a *good faith* effort to advance corporate interests." *Caremark,* 698 A.2d at 967. Such arguments by the Defendants go towards the liability, or lack thereof, on the breach of fiduciary duty theory. The Committee does not need to prove liability in order to withstand a motion to dismiss.

The Committee has alleged that the D & O Defendants owed a fiduciary duty to the Company. The selection and engagement of Hygrade are alleged to have been done in a grossly negligent manner by the D & O Defendants. The acquiescence of the D & O's in Kemeny's decision to ignore the

Steering Committee's recommendation against the Hygrade retention is a theory that may be explored beyond this stage of litigation and is sufficient under the 12(b)(6) standard.

### ii. Corporate Waste

■■■ The standard for waste is set forth by the Delaware Supreme Court in *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000). The *Brehm* Court stated:

> The judicial standard for determination of corporate waste is well developed. Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade ... If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstance the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky.

*Brehm*, 746 A.2d at 263, *citing*, *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del.Ch. 1997). Waste cases, the Court went on to say, are "confined to unconscionable cases where directors irrationally squander or give away corporate assets." *Brehm*, 746 A.2d at 263.

■■■ "Directors and officers are guilty of corporate waste, only when they authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del.Ch.1993). A corporate waste claim must fail if the corporation received any benefit from the challenged transaction or if there is a good faith judgment that the transaction is worthwhile under the circumstances. *Brehm*, 746 A.2d at 263.

■■■ First, an important part of the Plaintiffs allegations are that the integrated logistics system which Hygrade designed and implemented for TEU was a complete failure and resulted in injury. To this end, the Complaint states:

> 94. Because the Hygrade Logistics System was not operational, useful, and functional to support TEU's business activities, TEU's ability to operate its business was severely impaired and TEU suffered severe injuries, including, but not limited to, the following:
>
> (a) TEU expended at least $2 million on fees and expenses paid to Hygrade for services that failed to provide TEU with an integrated logistics system ...
>
> (b) TEU incurred significant extraordinary expenses that were necessary to mitigate the adverse effects of the deficient Hygrade Logistics System ...
>
> (c) TEU lost substantial profits in the many millions of dollars as a result of lost sales revenues;
>
> (d) TEU incurred significant extraordinary expenses in operating its business including, among other things, overtime, the costs of temporary personnel and freight charges;
>
> (e) TEU's goodwill with its customers and the trade generally was seriously damaged; and
>
> (f) *TEU was rendered insolvent as a result of the deficient Hygrade Logistics System designed, installed, and implemented by Hygrade.*

(Complaint ¶ 94) (emphasis added).

We agree with the comments in *Telxon Corp. v. Bogomolny*, 792 A.2d 964 (Del.Ch. 2001), where the Chancery Court evaluated a claim for waste under Delaware's 12(b)(6) motion to dismiss. The Court of Chancery upheld claims for waste and breach of fiduciary duty, noting that it "[could not] conclude, based on the well-

pleaded allegations of the Amended Complaint, that no set of facts could be shown that would permit the court to conclude that the [transaction] constituted an exchange to which no reasonable person not acting under compulsion and in good faith could agree." *Telxon,* 792 A.2d at 976. The Court concluded that "the terms and circumstances of the [transaction] appear at this point sufficiently unusual to require the court to allow the claims to survive beyond the pleading stage." *Id.*

The Committee's complaint in essence states that what TEU received from the engagement of Hygrade was wholly lacking in value and could ultimately be found to be corporate waste. Therefore, the facts alleged in the present Complaint when viewed in the light most favorable to the Plaintiffs set forth a sufficient basis for the claim of corporate waste and mismanagement by the D & O Defendants. The selection, engagement, and subsequent failure of Hygrade is "sufficiently unusual" to allow the claim to proceed beyond the pleading stage and the motion to dismiss by the D & O Defendants must be denied.

## C. Defendant HDDS' Motion to Dismiss[4]

 The argument set forth by HDDS for dismissal is basically as follows: since HDDS was neither a signatory nor party to the contract with TEU, there is no valid cause of action against them. "It is a general principle of contract law that only a party to a contract may be sued for breach of that contract." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood,* 752 A.2d 1175, 1180 (Del.Ch.1999). Thus, a breach of contract and related negligence causes of action cannot lie against a party who was not a party to the contract. The Agreements explicitly state that HILS and TEU were the parties to

the contract, not HDDS. The Plaintiffs have set forth no facts which allege that HDDS was a party to the various Agreements. Therefore, the Plaintiffs have failed to plead a cause of action that may entitle them recovery against HDDS. The claims against HDDS are dismissed.

## D. Defendant HILS' Motion To Stay Proceedings and Compel Arbitration

Defendant HILS moved for an order to enforce the arbitration provisions of the underlying contracts between HILS and TEU and to stay litigation as to the claims asserted against HILS, pending arbitration, pursuant to the United States Arbitration Act 9 U.S.C. §§ 1 *et seq.* The Committee's arguments are as follows: (1) there was no agreement to arbitrate the issues raised in the Complaint; (2) some of the agreements between the parties contain arbitration clauses and others do not, making arbitration inappropriate in this case; and (3) the arbitration clauses which do exist are narrowly drafted and wholly inapplicable to the claims asserted by the Committee.

The parties' assertions require examination of §§ 2, 3 and 4 of Title 9. Section 2 provides, in pertinent part, that arbitration agreements "*shall* be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). Section 3 further states as follows:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the

---

4. The 12(b)(6) portion of the motion to dismiss by the HDDS Defendant will be considered according to the standard set forth in Section II(A)(i).

issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . .".

9 U.S.C. § 3. The Act also authorizes the court to issue an order compelling arbitration if there has been a "failure, neglect, or refusal" to comply with an arbitration agreement. 9 U.S.C. § 4.

 Our analysis is guided by *Shearson/American Exp. v. McMahon,* 482 U.S. 220, 226–227, 107 S.Ct. 2332, 2337–38, 96 L.Ed.2d 185 (1987) and the Third Circuit's decision in *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 885 F.2d 1149 (3d Cir.1989). It is well established that arbitration is a favored mechanism for resolving disputes, especially where the parties previously agreed to utilize arbitration. "It is stressed that, if an issue is arbitrable under the agreement, the Arbitration Act leaves a court without discretion" and requires that the trial be stayed until arbitration is completed. *Hays,* 885 F.2d at 1156. The *McMahon* Court, as quoted in *Hays,* held:

> The Arbitration Act thus establishes a "federal policy favoring arbitration," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24[, 103 S.Ct. 927, 941, 74 L.Ed.2d 765] (1983), requiring that "we rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd,* [470 U.S.] at [213] 221[, 105 S.Ct. 1238 at 1242, 84 L.Ed.2d 158 (1985)]. This duty to enforce arbitration agreements is not diminished when a party bound by an agreement raises a claim founded on statutory rights . . . .
>
> *The Arbitration Act, standing alone, therefore mandates enforcement of agreements to arbitrate statutory claims.* Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. *The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.* See [473 U.S.] at 628[, 105 S.Ct. at 3354]. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent "will be deducible from [the statute's] text or legislative history," *ibid.,* or from an inherent conflict between arbitration and the statute's underlying purposes. See *id.* at 632–37[, 105 S.Ct. at 3356–59]; *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. at 217[, 105 S.Ct. at 1240]. To defeat application of the Arbitration Act in this case, therefore, the McMahons must demonstrate that Congress intended to make an exception to the Arbitration Act for claims arising under RICO and the Exchange Act, an intention discernible from the text, history, or purposes of the statute.

*Hays,* 885 F.2d at 1156, *quoting, McMahon,* 482 U.S. at 226–27, 107 S.Ct. at 2337.

The *Hays* Court then proceeded to determine whether the "District Court lacked the authority to deny enforcement of the arbitration clause unless Hays had met its burden of showing that the text, legislative history, or purpose of the Bankruptcy Code conflicts with the enforcement of an arbitration clause *in a case of this kind, that is a non-core proceeding . . .*" *Hays,* 885 F.2d at 1156–57. The Third Circuit found no provisions in the text of the Code suggesting that arbitration clauses are unenforceable in a non-core proceeding. *Id.* at 1157. The Court also found no underlying purpose of the Code would be adversely affected by enforcing the arbitration clause. *Id.* at 1161.

▌Furthermore, even though it is "generally preferable to have all issues pertaining to property of the estate and claims against the estate decided in a single forum, that rule is not without exception." *SFC Holdings, Inc. v. The Earthgrains Co. et al. (In re GWI, Inc.),* 269 B.R. 114, 119 (Bankr.D.Del.2001).

The present claims against HILS involve non-core proceedings under 28 U.S.C. § 157. The two claims asserted against HILS in the Complaint are common law breach of contract and negligence. Neither claim involves federal bankruptcy law—they are common law claims based on state law. The claims could have arisen outside the bankruptcy case in a state court of competent jurisdiction. If TEU had never filed for Chapter 11 protection, the claims for breach and negligence could have still been brought against HILS.

▌Therefore, this Court will enforce the arbitration clauses to the extent that they are enforceable since the claims involve non-core matters and enforcement of such clauses will not subvert any provisions or underlying policies of the Bankruptcy Code according to *Hays* and *McMahon.*

There were six signed agreements involving HILS. The agreements were between HILS and TEU, via Our Delivery Service, LLC, a Virginia company set up for the engagement of HILS. The agreements were as follows: (1) Delivery and Warehousing Service Agreement ("Service Agreement"); (2) Management Agreement; (3) Interim Service and Management Agreement ("Interim Agreement"); (4) Software License Agreement; (5) Software Maintenance Agreement; and, (6) Preferred Escrow Agreement [Certification of Richard Merians, Exhibits 1–6 (Doc. No. 27)]. All of the agreements were signed on March 12, 1998, except for

the Escrow Agreement which is dated December 12, 1998. The effective date of the Service and Management Agreements is subject to dispute while both Software Agreements were effective as of March 12, 1998. Five of the agreements provided for arbitration through arbitration clauses while the Interim Agreement does not provide for arbitration. The arbitration clauses are as follows:

*Service Agreement*

25.1. *In the event of a dispute between the parties with respect to any term of this Agreement or with respect to any claim of default against either party,* that dispute shall be submitted to arbitration before the American Arbitration Association in its Richmond, Virginia office ... [t]he Arbitration Provision of the License Agreement and Maintenance Agreement shall govern arbitration under those Agreements.

*Management Agreement*

19. *In the event of dispute between the parties that arises over any issue involving this Agreement or the performance thereunder,* that dispute shall be resolved by arbitration ... [t]he decision of the arbitrator in such proceedings shall be final.

*Software License Agreement*

3(d). This License is irrevocable during the term, except in the event of willful breach by ODS or TEU of those provisions of Section 3(c) [Prohibited Use] ... or in the event of non-payment of any portion of the license fee not cured within forty-five (45) days ... HILS may revoke this license only by written notice to ODS and TEU. ODS and TEU shall have the right o contest such revocation by written notice to HILS *in which case the issue as to whether the revocation has or has not been appropriate under the terms of this agreement*

*shall be submitted to arbitration ...* ODS and TEU may continue to enjoy the benefits of this License Agreement pending the outcome of arbitration. The determination by the arbitrators as to whether HILS properly revoked the license pursuant to the terms hereof shall be final and binding on the parties.

*Software Maintenance Agreement*

9(e)(vi)(b). In the event HyGrade issues a Notice of Contest of Default and the party making Notice of Default acknowledges that HyGrade's efforts pursuant to Section 9(e)(iii) have cured the alleged Default to its satisfaction, both the Notice of the Default and the Contest of Default shall be deemed withdrawn and the parties shall take all steps necessary to terminate promptly any *arbitration* or other proceedings to resolve that dispute. In the event HyGrade asserts that it has cured the Default, but the party issuing the Notice of Default does not acknowledge that the Default has been cured, *that issue shall be submitted to arbitration* together with the issue of whether or not the failure was the result of HyGrade's Default.

9(e)(vi)(c). In the event that HyGrade issues a Notice of Consent of Default, then such Contest of Default shall be submitted to binding and final arbitration ...

*Preferred Escrow Agreement*

7.3 Dispute Resolution. Except as allowed in Section 4.1 [on release] and Section 6.2 [on payment terms], *any dispute relating to or arising from this Agreement shall be resolved by arbitration* under the Commercial Rules of the American Arbitration Association ... [n]ot withstanding the foregoing, Preferred Beneficiary [Jefferson Yorktown This End Up, Inc.] shall have the right to seek equitable remedies from a court

of competent jurisdiction including specific performance.

[Merians Certification, Exhibits 1, 2,4,5 & 6](emphasis added).

The Committee's primary argument is essentially that there is no arbitration clause as to HILS, since the Interim Agreement governed the parties at all times because TEU terminated the relationship before that Agreement's termination. The Interim Agreement establishes an "Interim Period" as well as a "Trial Period." According to the Interim Agreement:

Notwithstanding the execution of the Service Agreement and the Management Agreement, the parties have determined that, for an interim period of six (6) months from and after the date hereof ("Trial Period"), the parties shall conduct, on a trial basis, the performance of the warehouse and delivery services for TEU by ODS and the performance of the management services for ODS by H.I.L.S.

This is the Agreement that governs the rights, obligations and liabilities of the parties during the Trial Period. To the extent there are variances between the terms of this Agreement and the terms of the Service Agreement or the Management Agreement, the terms of this Interim Agreement shall govern ...

1. This Interim Agreement shall govern the rights, obligations and liabilities of the parties with respect to the Service Agreement and the Management Agreement for the Interim Period. The Trial Period Shall commence on the date hereof and shall terminate on September 12, 1998. The Interim Period shall commence on the date hereof and shall terminate on January 1, 1999.

[Merians Certification, Ex. 3 at 1–2]. As to when the Service and Management

Agreements become operational, the Interim Agreement states:

> 8. In the event neither party shall exercise the right of termination provided herein, then after the expiration of six months from the date hereof, the Service and Management Agreements shall become fully operational and all provisions of each of them, together with the License and Maintenance Agreement shall become fully effective and operational at that time, subject however, to the terms of Section 2(g).

[Merians Certification, Exhibit 3 § 8]. Section 2(g) of the Interim Agreements provides:

> (g) For that period commencing at the end of the Trial Period, up to but not including January 1, 1999, if the Service and Management Agreements are not terminated pursuant to the terms hereof, TEU shall continue to pay all costs of operations, as described in this Article 2 ... and the fee structure in the Service and Management Agreements shall become effective on and after January 1, 1999.

[Merians Certification, Exhibit 3 § 2(g)].

The parties subsequently extended the Trial Period through December 31, 1998 pursuant to a written modification executed on or about September 11, 1998 [Merians Certification, Exhibit 3]. TEU advised HILS by letter dated December 22, 1998 that "pursuant to Section 4 of the Interim Agreement, TEU hereby terminates the Delivery [and Service] Agreement and the Management Agreement, effective as of December 31, 1998" [Merians Certification, Exhibit 7]. The Committee argues that since the Service and Management Agreements were terminated before becoming effective, the Interim Agreement was the controlling agreement. Therefore there is nothing arbitrable under the Service and Management Agreements.

The opposing argument by HILS is that the Interim Agreement by its explicit terms provided for certain payment mechanisms and other matters unrelated to dispute resolution [HILS Supp. Brief at 1–2]. The terms not concerning payment in the Service and Management Agreements are still applicable to the parties, including the arbitration provisions. Essentially, HILS' argument is that all of the agreements were fully integrated, and the Interim Agreement only controls those provisions which it speaks to.

The Court agrees with HILS. Virtually every provision contained within the Interim Agreement concerns payment between the parties. Equally telling, many provisions regarding such payment begin with the caveat "notwithstanding provisions of the Service Agreement." Several provisions illustrate this point. The Interim Agreement provides:

> 2.(a) Notwithstanding the language of Article 12 of the Service Agreement, ODS shall employ, but TEU shall enable ODS to pay all central distribution center employees ... [i]n addition, ODS shall employ but TEU shall provide the funding to enable ODS to pay the costs of all truck drivers ...

> (b) Notwithstanding that Article 12 of the Service Agreement provides that ODS shall determine all salaries, wages, commissions, ... and such other payments required by law, TEU shall provide the funding to enable ODS to pay all such employee benefits consistent with benefits paid ...

> (c) Section 3.2 of the Service Agreement provides that ODS will provide TEU adequate cross dock facilities in the locations provided therein at TEU's expense. Notwithstanding those provisions, during the Interim Period, TEU

shall pay all lease payments associated with cross dock facilities. . . .

(e) Notwithstanding anything in the Service Agreement to the contrary, during the Interim Period, TEU shall pay all other operating costs and provide all funding to ODS . . .

(f) Notwithstanding provisions of the Service Agreement relating to the payment of fees to ODS by TEU, TEU's obligations during the Interim Period shall be to pay costs set forth in this Interim Agreement.

3. During the Interim Period, payments to HILS for services performed under the Management Agreement shall be governed by this Interim Agreement and not by the Management Agreement.

(b) HILS shall bill ODS and TEU on a weekly basis for all costs and expenses actually incurred during that week . . . HILS obligations in connection with management shall be as set forth in the Management Agreement.

[Merians Certification, Exhibit 3 §§ 2 & 3].

The Court finds that the Interim Agreement initiated the relationship and to that end, was designed to govern payment until the relationship evolved. If the Service and Management Agreements had no operative effect on the parties' relationship during the Trial Period, as the Committee asserts, there is no reason for the "notwithstanding" clauses in the Interim Agreement. The terms of the Interim Agreement appear to be limited, and could not have been intended to encompass the entire relationship.

A more logical conclusion is that the agreements are integrated and must be taken as a whole, not as individual agreements that were meant to stand alone. The Interim Agreement was intended to control the parties' relationship on those issues which it addressed, as it states, while the Service and Management Agreements provided for everything else not contained in the Interim Agreement. Similarly, any software issues are governed by the Software Incense and Maintenance Agreements. Since there are no provisions regarding dispute resolution contained in the Interim Agreement, and all of the agreements are integrated, the arbitration provisions in the remaining agreements are applicable to disputes between the parties.

Finally, the Committee asserts that the arbitration provisions in the agreements are narrow and thus cannot be enforced. The arbitration clause in the Service Agreement mandates arbitration for "any dispute between the parties with respect to any term of this Agreement . . ." [Merians Certification, Exhibit 1 § 25.1]. The Management Agreement provides arbitration for "any issue involving this Agreement . . ." [Merians Certification, Exhibit 2 ¶ 19]. The provisions of the Service and Management Agreements are expansive and cover any claim arising out of the Service and Management Agreements. The arbitration clauses are wholly applicable to the present claims against HILS since it is alleged that they breached their "promises" to TEU under those agreements [Complaint, ¶ 147].

The Software License and Maintenance Agreements arbitration provisions are more narrow than the other agreements. However, the Sixth and Seventh Claims for Relief by the Committee contain no allegations regarding revocation of the software license or an event of default, and thus that arbitration clause is not applicable. [Doc. No. 1, ¶¶ 135–154]. In the event there is a dispute arising out of the Software Agreements, such dispute may be arbitrated along with the other claims against HILS.

In conclusion, the agreements between the parties were fully integrated contracts and the arbitration provisions therein apply to the claims against HILS. The Arbitration Act requires that this Court stay the present litigation and compel arbitration of all claims against HILS. The motion to stay litigation and compel arbitration by HILS is granted.

### E. Dismissal of the Third Claim For Relief

■ The Third Claim for Relief in the Complaint is for avoidance of certain payments to Kemeny and Wall, as fraudulent transfers, pursuant to §§ 544, 548(a)(1)(A) and 550 of the Code [Complaint, ¶¶ 110–114]. Recently, the Third Circuit Court of Appeals, in *Cybergenics v. Chinery*, 304 F.3d 316 (3d Cir.2002), held that a creditors committee may not assert fraudulent transfer claims under § 544, finding that only the trustee or debtor-in-possession may bring such actions. Due to the decision by the Court of Appeals on this issue, the Court now raises this issue *sua sponte*. Sua Sponte dismissal is appropriate if the basis is apparent from the face of the complaint. *Ray v. Kertes*, 285 F.3d 287, 297 (3d Cir.2002). A court "may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action." *Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir.1980).

Therefore the fraudulent transfer claim against Defendants Kemeny and Wall is hereby dismissed. The prior order of this Court authorizing the Committee to pursue avoidance actions [Case No. 1098, Doc. No. 1646] is hereby vacated.

### III. *CONCLUSION*

For the foregoing reasons, the D & O's motion to dismiss Plaintiff's Fourth and Fifth Claims for Relief is **DENIED.** Defendant James A. Wall's motion to dismiss

is **DENIED.** Defendant HDDS' motion to dismiss all claims asserted by Plaintiff is **GRANTED.** The motion of Defendant HILS to stay litigation and compel arbitration is **GRANTED.** The Plaintiff's Third Claim for Relief is **DISMISSED.**

The parties shall submit an order within ten (10) days.